Our next case is Active Network, LLC v. United States. Next case, please. Next case, please. Next case, please. Okay, you may begin, but I do want to question, there's a couple of things I need to address. First of all, you're Counselor Marcotti, is that correct? Marcotti. And you're reserving seven minutes of your time for rebuttal? Yes. And Counselor Finnan, you're going to speak for ten minutes. And Counselor Coley? Coley. Coley. That's all right. You have five minutes. Did I get the time correct? Yes, Your Honor. So let's address the issue of the confidentiality material in the record. The record is heavily marked. The briefs have marking in them. Are we free to discuss those issues that are marked in yellow in the briefs? I'm asking either of you. I need a response. From the government's perspective, the parties negotiated what would be public and not. So the yellow in the briefs from the parties' position is still sealed. We have prepared to come to an open hearing today, at least for government's part, and to the extent something under seal came up, we would simply point the panel to the page number where the answer was rather than saying an open court. But we're amenable to whatever works for the panel. Are you okay with that? Yes, Your Honor. I would say that the parties went back and forth quite extensively to try to come up with something that we thought would be workable and allow for fair oral argument but still protect information that people felt was required to know. Okay, let's go forward. Sir, you have to step up here. Thank you. This case will be slightly less technical than the one that the court just heard. A different form of technical. But it does involve the award of a contract that people across the United States and really from all over the world will use to buy reservations for visiting national parks, U.S. national forests, and other federal facilities for recreation purposes. There isn't really any question here that the procurement process suffered from flaws. I understand that there were four sections involved in this particular proposal or the solicitation. And you're challenging only one of those sections. Is that correct? I wouldn't say that we're just challenging one section of the solicitation. I wouldn't say we're challenging the solicitation at all. What we're challenging is the evaluation under the solicitation. Well, okay, there was four. The part of the evaluation involved an evaluation of four different parts. And you're challenging only one of those parts. We're challenging the technical evaluation as well as the conduct of discussions. Okay, so you're challenging the technical. So that means that the other three sections, the company that got the award on those three sections, even if we were to find in your favor, what do you win? I mean, your opponent, your competitor in this case, prevailed in the other three sections. You're only challenging one of those sections. But even if we were to find that you're correct, what does that do to the other three sections? Isn't the outcome the same? Well, it's not the type of evaluation where you take four separate sections and you get one point for winning each of them and you add it up at the end and you say three to one, you win. This is a best value procurement where the agency is going to take a look at your proposal in each of the areas. And technical was obviously a critical aspect of that. They're going to evaluate the merits of that. They'll look at your pricing. They'll consider that. And they'll look at the other areas as well. But at the end of the day, the agency has to... So let's say the agency does that. We send it back and the agency does that and makes a re-evaluation on the technical aspect. And the other three sections, their evaluation of their decision remains the same. What does that do? Do you win? If there's a material change in the technical evaluation, yes, we absolutely could win. You're not challenging the format of the technical evaluation. You're challenging the outcome. The decision with respect to the technical part of the grant. What we're challenging is we're challenging specific aspects of the evaluation that we think demonstrate the evaluation itself was arbitrary and irrational and unequal in a number of different ways. Our view is that if we are successful in our challenge, the more likely scenario is that the agency would take this back and reopen discussions. And the parties would have a chance to address the issues that we've raised where we think there's some devaluation. And essentially, you'd have a new award decision. I mean, this case has already been back once. The Court of Federal Claims sent the case back to the agency for re-evaluation once already with respect to the price evaluation. It found that that was not sufficient, sent it back. It also found that ACTIV had raised legitimate concerns about aspects of the technical evaluation. So even the Court of Federal Claims was not saying this was a perfect evaluation. What this appeal about is we're attempting to point out some additional areas of flaws that the Court of Federal Claims overlooked. One significant one is in the area of discussions. The Federal Acquisition Regulation 15-306-D3, and that's about as technical as I'll get in my argument today, requires the agency to do three things when it conducts discussions. First, they need to indicate or discuss with each offeror their deficiencies, which are typically areas of noncompliance with some requirement, significant weaknesses, which are meaningful problems with the proposal. And third, they need to address adverse past performance information, which the offeror has not yet had an opportunity to respond to. They can do more than that, but they can't do any less. The Court of Federal Claims found it was undisputed that ACTIV's proposal had a deficiency right from the start because it failed to commit to meeting the system uptime requirements. The solicitation had a specified time that the system had to be up. It was 99.98886, very demanding. ACTIV did not, in the agency's view, commit to meeting that standard. They later on found it was a deficiency, and it's uncontested that the agency didn't point it out during the course of the evaluation. Had they done so, we contend ACTIV would have been able to address that deficiency and fix it. I'm puzzled by your client's reaction. The number 99.886 or whatever it was, 98886, is a very specific number, and you came back with another very specific number, 99.5, which was lower. It was outside of the qualifying range. I don't know what it is that the agency could have done more than saying your first proposal was not qualifying on this score, since it wasn't a matter of judgment. It was just a matter of numbers. Your number was lower than the required minimum, right? You have to go back to the initial proposals that were submitted. It's alluded to in our briefs, and it's also in the Court of Federal Claims decision. What ACTIV was doing was it was addressing, on one hand, what it called the standard, which it was aiming for 100 percent. On the other hand, it was addressing what it called an AQL, acceptable quality level, and it had a lower number in there. The AQL is important because that's where penalties will kick in under the solicitation evaluation plan. So that's where ACTIV had its proposal in a confusing presentation, and certainly it is your fault. But it was clear from the start that the agency looked at that and said we don't have a firm commitment to that system uptime requirement, and they didn't bring it forward to ACTIV. When they had questions about system uptime compliance, they raised them specifically with other offerors. They asked who's Alan Hamilton. We refer to him as BAH here. They asked them with respect to their uptime commitment, is this an SLA, a service level agreement? Is this something you're actually proposing? We don't see where SLA appears in the RFP, at least in the core of the RFP, but the agency was looking to BAH to confirm what you're really offering us for uptime, and BAH did. There was another offeror where they sent to- You're into your rebuttal time. You can continue if you wish and use that, or you can reserve the time. I'll continue briefly. There was another evaluation offeror that received two evaluation notices on there, and in one of them, they asked them very specifically, what exactly are you committing to in an SLA for uptime? They were able to answer that question and alleviate that, so that's what our concern is with that area. The Court of Federal Claims reading on why that wasn't an error is probably the most disturbing part of the decision. They found that agencies didn't have to advise offerors of deficiencies or weaknesses if the deficiency or weakness was attributable to something that had been clearly stated in the RFP or solicitation, and that's just completely inconsistent, not only with the exact language of the Federal Acquisition Regulation, but also decades of case precedents interpreting that. It was just a plain mistake. Beyond that, we've briefed it. We believe that there are multiple areas where the agency engaged in treatment that was disparate between active and other offerors. We believe that that type of unequal type of treatment eventually rolls up to a situation where the procurement has to be reopened and people be given a fair chance to compete on an equal playing field. I'll go ahead and reserve this one. Okay, thank you. Counselor Freeland, you've got ten minutes. Yes, Your Honor. On behalf of the United States, we believe that the Court of Federal Claims properly found the Forest Service contract award to Booz Allen Hamilton was rational reasoned and not contrary to law. To address some of the panel's concerns, yes, active network is only challenging factor one. That means that regardless of the outcome of this appeal, Booz Allen's far superior ratings under factors two and factors three, where they received an outstanding under both, and relative to active networks. So if we were to remand this and the agency found in favor of the appellant, the appellant basically would still lose. Is that correct? Yes. The appellant has not brought forth enough grievances under enough factors to ultimately change the rating, which is why the trial court correctly found that there was no prejudice even if, with respect to the two issues Judge Wheeler identified. How is the rating achieved by weighing out the four different sections of the solicitation? So the first three factors, factor one, technical, factor two, the in-person presentation, and factor three, past performance, were each individually rated and weighted separately, and then when together were more important than price. However, as the degree of technical differences between the entities narrows, then price becomes more important. In this instance, Booz Allen's proposal, as the source selection evaluation team found, was so vastly superior, and Booz Allen had the lowest price, that then there was no reason to engage in what they call best value tradeoff to determine if somebody else was better. The SSET team, the evaluation team who evaluated the proposal back at the agency, found that Booz Allen had 88 strengths, no weaknesses, and no deficiencies. In stark contrast, Active Network, our protester, had only 24 strengths, seven weaknesses, and three deficiencies. So if we then go to the grievances that Active Network has brought forth on appeal, even under factor one, in certain instances it challenges, it got a deficiency for two reasons. It's only challenging one of those reasons before this court. So even if this court were to find that that one reason for challenging a deficiency represents a procurement defect, there's still an unchallenged reason for the deficiency that Active Network isn't challenging. So the deficiency would still stand. Could you address the issue of the uptime percentage and the discussion question that Mr. Marcotte discussed with court? Yes. So from the government's perspective and the agency's, the problem was not with, in the uptime commitment context, the problem was not with discussions. It was with Active Network's ultimate failure to provide an uptime commitment that was consistent with the plain language of the RFP. So at the initial proposal stage, Active Network failed to commit to any uptime. So there's a clear requirement in the RFP for 99.986%. Active Network says in its initial proposal, well, in the past we performed at 100%, and we'll take monetary sanctions in the future for 99.5%, I believe, right? But they didn't actually say, well, in the past we performed for 100%. They didn't make any commitment for the future performance. And so that failure to make a commitment at the initial stage was one of the many vague and nebulous statements that the agency faulted Active Network for in its evaluation notices. What exactly in the evaluation by the agency did the agency say about the failure to recite the 99.986%? What I'm trying to get at is did what the agency do with respect to that fact, that omitted representation in the response constitute discussions and why? Yes, Gerardo, we would submit it did constitute discussions. There is not, well, let me take a step back. The agency gave, in discussions, the agency gave Active Network 118 evaluation notices. That's relative to the 55 evaluation notices that Booz Allen's proposal received. Okay, Active Network's proposal, as the agency found, was so vague. Well, I understand. I understand your general argument of that. But I'm trying to get to the specific, the extent to which the agency specifically responded to the uptime commitment. Did the agency say you have no, you haven't put in anything, any specific commitment. You have to put in a commitment to 99.98886. Understood. No, it did not. There is no evaluation. What did they do that, in your view, constituted substantial compliance with the discussion requirement on that precise issue? So there is no mention on that precise issue in any of the evaluation notices. There is, however, in Evaluation Notice 101, and that's at Appendix 13762, the more general and overarching comment and explicit direction from the agency that their proposal was too vague, too nebulous. Reading from that evaluation notice, the Active Network proposal contains a substantial amount of vague language throughout which obfuscates your specific approach to satisfying all the requirements defined in the RFP. They then went on. The proposal extracts are just some of the many examples of the nebulous language, and they gave about a page worth of examples. Now, none of those examples were specifically the uptime commitment, but they say this is not an exhaustive list, right? Then they go on to say, uses of the phrases emphasized above in the examples, and countless similar phrases throughout the proposal, make it impossible for the evaluation team to unequivocally understand what you are specifically proposing to develop, deliver, or provide under the resulting contract. And I can go on. There's several other comments in that regard. But the fact that Active Network's initial proposal was only backward looking. They were the incumbent. They said, oh, in the past, we performed at 100%, but didn't make any finite commitment for future performance, is exactly one of those nebulous statements that the agency was tasking Active Network to fix if it wanted to stay competitive in the final proposal. Agency goes on to say, the offeror, quote, shall revise their entire proposal from cover to cover, replacing all of their vague language, such as that the final proposal articulates a clear, unambiguous, and comprehensive approach to satisfying the requirements as defined in the RFP. Now, yes, there was not an EN that specifically addressed uptime. But we submit that this notice gave Active Network sufficient information to know that it had to go back through its proposal and compare its proposal to the RFP and make sure it complied with requirements. And as a practical matter, they did do that, right? Active Network, to the extent they're complaining before the trial court and here, that they didn't have notice of their failure to comply with a plain language requirement in the RFP. Their conduct says otherwise. Between the initial proposal and the final proposal, they did, in fact, revise the uptime commitment to adopt an uptime commitment in the final proposal. So clearly, they knew something needed to be fixed. What ultimately happened, however, is that in their final proposal, they picked a percentage that was plainly at odds with the RFP. But that's not the agency's fault at that point. That's Active Network's fault for not reading a plain language requirement of the RFP. Which the RFP requires of all offerors. They put the burden in the RFP specifically. They put the burden on the offeror to comply with those requirements. Let me ask you a question just about the state of play right now. Who's the incumbent contractor at this point? Active Network has been the incumbent contractor on the last generation contract. It's been about the last 10 years or so. But they continue to be the contractor pending the disposition of this appeal? Is that what the state is? Not exactly. So at the trial court level, the agency agreed to voluntarily stay performance of its award to Booz Allen pending the trial court's judgment. When the trial court entered its judgment, that stay automatically lifted. And Booz Allen began performance under the new contract. However, the first 15 months of this new contract is a phase in where Booz Allen is setting up the new platform and such. So essentially both Booz Allen and Active Network are performing. Active Network has a bridge contract. Okay. Thank you. Let's hear from your colleague. Mr. Kolek. Good morning, ma'am. Please, the court. Judge Range's first question has disrupted things for me because you went right to the top of my outline. I really do want to address the first. We can save the time, then. Well, I just want to elaborate a moment on that if I can have that indulgence. The first question I think this court has to resolve is whether or not this appeal should even be allowed to go forward. If you look at teachings of cases like Labatt and Common Systems, standing is determined in part based on prejudice. And Judge Range is exactly correct. There were four factors that were looked at, one of which was price and the other which were equally weighted, equally weighted. All of Active's objections relate only to factor one. This isn't – you use the word best value like it's some sort of nebulous term. All that best value means is that the non-price considerations get traded off against the price considerations. Analytically, is there any difference between what we would do by way of investigating whether this is a standing problem as opposed to a merits problem turning on prejudice? Analytically, you would come to the same prejudice analysis. That would be correct. It would be identical analysis, right? But the outcome may be different in the sense that the – once you've reviewed the merits of whether there was a flaw in the evaluation or flaw in the problem, then you might decide that there was something wrong and at that point, even though they had standing, decide that there was not enough prejudice to result in a need to go back and correct the problem. The prejudice analysis that you do at the beginning is the front gate. Do you get in? Do you know already without having even thought about the merits? And we know based on what ACTIV has told us in their brief. At the end of their brief, they gave us a nice table and said here's what we think would be the outcome if we win across the board. If they win across the board, they're tied on one factor. Booz Allen still wins on factors two and three. Those are the non-price considerations. You don't have to do a tradeoff with price. Booz Allen is also low price. This case is over. They have an obligation to achieve standing in this court or in the Court of Federal Claims to show that there's a substantial chance that they're going to win the award if they prevail. What they've told you in their brief is we don't have any chance of prevailing if we win everything. That's a standing issue and you can resolve this case. It's positive. We're done. We don't have to worry about all the other issues. Let me turn to a moment, though, about the discussions question. And I would draw your attention to one other aspect of the discussion. It's on page 15 of Booz Allen's brief. There were some very specific statements, not about the specific percentage but about the specific problem. Discussions in the government contract realm is a pretty well-known term of art. Agencies aren't required, the classic language is, to spoon-feed the offeror about what to fix in their proposal. They need to flag an area of concern. And there's a lot of cases, and they're all cited in the briefs, about that. There's no obligation to go back and engage in multiple rounds of discussions. So what the agency did here was flag an area where ACTIV had problems in its proposal multiple times. Multiple times they relied on their historic performance rather than making a commitment to the future. And quoting the language that we've got on page 15, the agency, during the discussions with ACTIV, told them, the proposal you originally submitted was very much, this is what we've done in the past. It was hard for us to tell from that what you were going to do in the future. So that's the biggest thing. Show us what it's going to be like in the next contract, not the last contract. With that advice, ACTIV went forward in its next proposal and made an addition about this system uptime that hadn't appeared in their initial proposal. What did it add? It added a specific commitment to what they were going to do in the future, the percentage that they were going to commit to. The problem was the specific commitment that they made was not compliant with what was required. The problem here was not that the agency had not given them sufficient discussions or sufficiently alerted them to the problem. The problem was with how ACTIV responded. So they had plenty of discussions. They just screwed it up and had the deficiency. You know what? If there aren't any further questions, I'm going to stop right there. Any more questions? Thank you. Mr. McCook, I think you have a little under five minutes. With respect to the discussions issue, all ACTIV is looking for is to be treated in accordance with what the Federal Acquisition Regulation requires, which is if there's something deficient about the proposal, tell us what it is. Had it been clearly communicated, they would have had a chance to make it up. They wouldn't have made any mistakes on their next submission. They didn't get that advice. The other thing that's supposed to happen is people are supposed to be treated fairly, and there's evidence very clearly in the record where other offers that had some type of confusion around what they were proposing with respect to uptime got very clear questions and were able to resolve them. So we think that issue is very, very, very clear. Can you respond to the standing argument that was just made? Yes, I was just going to get to that. So standing and bid protest kind of has sort of a dual place. First, the court looks at it to see when you're going in, were you an actual offerer or would you have some chance of getting an award, and that's pretty liberal. And then their standing comes back at the end. But I would agree that it's merit-based. I think that if we succeed on all of our claims, it's very clear that we would have standing and be entitled to compete for the contract and whatever happens next, whether it's a reevaluation or reopening. This court has been very clear that a protester doesn't have to show that but for the alleged errors that it would have received the contract. That's not necessary. It needs to show that it would have been within the zone of active consideration with a substantial chance for award, which this court has also interpreted as being not an insubstantial chance of award. So it never has to be precise. It needs to show that you were going to win. And if you look at the nature of the errors, that plays into it as well. In the case of errors with the discussions process, the remedy is to allow people to get another chance to resolve that issue. The agency has to reopen discussions, and a lot can happen in a reopening discussions because they can submit a completely new proposal, as it would be allowed, unless there was some restriction on it. And then the other part is that a lot of the allegations— On that last point that you made, let me see if I understand you. Supposing we should say, well, the discussions with respect to the uptime commitment were flawed but no other flaws. Are you saying that the contractor would be entitled to submit a completely new proposal on all issues or just a proposal limited to the uptime commitment? So if a ruling was that narrow, I would say the agency would probably have discretion to limit discussions to that particular issue. But in general, absent some restriction, when you're asked to submit a new proposal with discussions, you can do it. The other thing that has to be taken into consideration is the nature of the arguments that ACTIV has been making. As the court's aware, arbitrary capricious action is one reason for sustaining a protest. The other is a clearly prejudicial violation of law and regulation. Many of the arguments that we're raising fall squarely within the arbitrary treatment area where we're arguing that there is unequal evaluation where the agency is giving credit for one thing to an offer and not giving credit to another. That's the type of issue where the requirement for standing is much relaxed. We'd point the court's attention to the Caddell construction case that we've cited in our brief at page 49. It's a Judge Williams-authored court of federal claims decision that goes in great detail with how standing applies using the cases that have come out of this court. The conclusion there is that when you have arbitrary capricious action, there may not be any requirement to show prejudice, or if there is, it certainly comes out to be a reduced one, and that's where we think we are with respect to standing. We think if we win on the merits, we think standing is very clear. I'll end there. Thank you. We thank the other party for the argument.